UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| PAUL PRYOR, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:23-CV-584-CHB |
| | ) | |
| v. | ) | |
| | ) | |
| BAPTIST HEALTH MEDICAL GROUP, INC., *et al.*, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion to Dismiss filed by Defendants Baptist Health Medical Group ("Baptist") and Dr. Michael Jason Wells. [R. 11]. Plaintiff Paul Pryor responded in opposition [R. 15], and Defendants replied [R. 15]. Pryor then moved for leave to file a sur-reply [R. 16], which Defendants opposed [R. 17]. For the reasons that follow, the Court will grant both motions.

### I.    Background

The following facts are drawn from Plaintiff Paul Pryor's Complaint. Pryor is a Federal Aviation Administration ("FAA") licensed aviation mechanic for United Parcel Services ("UPS"). [R. 1 (Complaint), ¶¶ 7, 8]. Because Pryor's position is "safety-sensitive," he is required by both the FAA and UPS to submit to random drug testing. *Id.* at ¶ 8. On November 18, 2022, Pryor submitted to a random urine drug test. *Id.* at ¶¶ 1, 17. On November 27, 2022, "the testing laboratory confirmed that Mr. Pryor's urine specimen had tested positive for codeine at a level less than 15,000 ng/mL." *Id.* at ¶ 18. When he received the test results, Pryor "informed Dr. Michael Wells," a Medical Review Officer employed by Baptist Health, "that he had consumed poppy seeds," which "can cause positive test results for codeine." *Id.* at ¶¶ 22, 1, 21.

- 1 -

According to the Complaint, "Codeine concentrations below 15,000 ng/mL are assumed to be from the ingestion of poppy seeds, with limited exceptions" and, after Pryor informed Dr. Wells that poppy seeds could be the reason he tested positive for low levels of codeine, "[t]he burden was on Baptist Health and Dr. Michael Wells to corroborate through clinical evidence that Mr. Pryor engaged in unauthorized opiate use." *Id.* at ¶¶ 21–22. Without doing so, Dr. Wells reported Pryor's positive drug test to UPS. *Id.* at ¶ 23. As a result, Pryor "was terminated from his employment with UPS for several months" before being re-hired, the relationship with his employer was "irrevocably damaged," the results of his drug test "were sent to DOT's national database where they are available for any future possible employer in the transportation industry," Pryor "was required to submit to evaluation as a drug abuser," and he "is now required to submit frequently to invasive and embarrassing observed urine specimen collections to maintain his employment." *Id.* at ¶ 24.

On November 8, 2023, Pryor brought this diversity action, alleging negligence against Dr. Wells, *id.* at ¶¶ 36–41, and negligence against Baptist based on a respondeat superior theory of liability, *id.* at ¶¶ 25–35. On January 10, 2024, the Defendants moved to dismiss Pryor's claims against them [R. 11], and simultaneously tendered their Answer [R. 12] to Pryor's Complaint. Pryor responded [R. 14], and the Defendants replied [R. 15]. Shortly thereafter, Pryor moved for leave to file a sur-reply [R. 16] and tendered his proposed sur-reply therewith [R. 16-1]. The Defendants opposed Pryor's motion. [R. 17]. Finally, Pryor tendered a Notice of Supplemental Authority [R. 18], directing the Court to a Kentucky Court of Appeals opinion published March 29, 2024 [R. 18-1].

The Court will grant Pryor's motion for leave to file a sur-reply [R. 16] and will consider the sur-reply [R. 16-1] and the supplemental authority [R. 18-1] offered by Pryor. Now fully briefed, the Defendants' Motion is ripe for the Court's consideration.

## II.     Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" if the factual allegations in the complaint "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Determining if a complaint sufficiently alleges a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). Further, "[t]he complaint is viewed in the light most favorable to [Plaintiff], the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in [Plaintiff's] favor." *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016) (citing *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008)).

## III.    Analysis

Defendants move to dismiss Pryor's claims against them on several grounds. First, they argue Pryor has no private right of action for any alleged violations of the federal regulations, guidelines, or standards cited in the Complaint. [R. 11-1, p. 4]. Second, Defendants contend that Pryor's "medical negligence" claims against Dr. Wells must fail because there is no patient-physician relationship between them. *Id.* at 6. Relatedly, even if such a relationship existed, Defendants submit that Pryor's medical negligence claims would also fail because he did not file a certificate of merit with his Complaint per KRS § 411.167, which requires the filing of such a certificate in actions against certain medical professionals and hospitals alleging negligence or malpractice. *Id.* at 7; *see also* KRS § 411.167; KRS § 413.140(1)(e). Finally, Defendants suggest that Pryor's claims against Baptist must fail for the same reasons as those against Dr. Wells, since those claims "are rooted in its employment of Defendant Dr. Wells." [R. 11-1, p. 8].

In response, Pryor first notes that he does not claim to have a private right of action for violations of any FAA or DOT regulations, and clarifies that he brings claims of ordinary, not medical, negligence against Dr. Wells and Baptist. [R. 14, pp. 12, 8–9]. As such, Pryor suggests he did not need to file a certificate of merit under KRS § 411.167. In reply, Defendants argue that, even if Pryor's claims are rooted in ordinary negligence, KRS § 411.167(4) and Kentucky case law nevertheless required that he accompany his complaint with "an affidavit or declaration" that no claim is being asserted for which expert testimony is required, and failure to do so likewise requires dismissal. [R. 15, pp. 4–5]. Pryor disagrees and criticizes Defendants' argument to the contrary as being untimely. *See* [R. 16-1 (Proposed Sur-Reply), pp. 2–3] ("On reply, Defendants now newly argue that KRS 411.167(1) required a Certificate of Merit be filed with Mr. Pryor's Complaint, even though Mr. Pryor's Complaint does not allege medical malpractice or medical negligence.").

For the reasons explained below, based on the allegations in the Complaint, which involve claims of professional medical negligence, Defendants are correct that Pryor was required to file a certificate of merit with his Complaint or to file an affidavit or declaration stating that no expert testimony was required. His failure to do either requires dismissal of his claims without prejudice.

KRS § 411.167, titled "Certificate of merit for medical malpractice actions," states as follows:

> (1) A claimant commencing any action identified in KRS 413.140(1)(e), or against a long-term-care facility as defined in KRS 216.510 alleging that the long-term-care facility failed to provide proper care to one (1) or more residents of the facility, shall file a certificate of merit with the complaint in the court in which the action is commenced.
>
> (2) "Certificate of merit" means an affidavit or declaration that:
>
>> (a) The claimant has reviewed the facts of the case and has consulted with at least one (1) expert qualified pursuant to the Kentucky Rules of Civil Procedure and the Kentucky Rules of Evidence who is qualified to give expert testimony as to the standard of care or negligence and who the claimant or his or her counsel reasonably believes is knowledgeable in the relevant issues involved in the particular action, and has concluded on the basis of review and consultation that there is reasonable basis to commence the action.
>
> . . .
>
> (4) A certificate of merit is not required where the claimant intends to rely solely on one (1) or more causes of action for which expert testimony is not required, including claims of res ipsa loquitur and lack of informed consent, in which case the complaint shall be accompanied by an affidavit or declaration that no cause of action is asserted for which expert testimony is required.

Ky. Rev. Stat. Ann. § 411.167(1), (2), (4). The types of actions identified in KRS 413.140(1)(e) are those "against a physician, surgeon, dentist, or hospital licensed pursuant to KRS Chapter 216, for negligence or malpractice." Ky. Rev. Stat. Ann. § 413.140(1)(e).

A compliant Certificate of Merit is an affidavit or declaration attesting that the plaintiff consulted with a qualified expert "who has concluded—after review and consultation—that there

- 5 -

is a reasonable basis to bring the action." *Evans v. Baptist Health Madisonville*, 643 S.W.3d 105, 107 (Ky. Ct. App. 2022) (citing Ky. Rev. Stat. Ann. § 411.167(2)(a)). Failure to adhere to the requirements set forth in the statute with respect to claims for which it is implicated "is grounds for dismissal." *Cleaver v. S. Health Partners, Inc.*, No. 3:21-CV-747-BJB-CHL, 2022 WL 1620626, at *2 (W.D. Ky. May 23, 2022); *see also Dumphord*, 2021 WL 3572658, at *5–6 ("Dumphord's . . . noncompliance with Section 411.167's requirements warrant dismissal of his [negligence] claim against Bourbon Community.").

As mentioned, Pryor characterizes his claims as those for "ordinary" negligence, as opposed to medical negligence, and suggests this distinction relieves him of Kentucky's certificate of merit requirement. Kentucky case law provides guidance on this issue.

In *Evans v. Baptist Health Madisonville*, 643 S.W.3d 105 (Ky. Ct. App. 2022), the plaintiff similarly characterized her claims as ordinary negligence to circumvent the certificate of merit statute. The plaintiff in *Evans* went to the emergency room because she was experiencing seizures, and because she "continued to experience symptoms while in the emergency room," she was "seated in a wheel-chair so she would not fall." *Id.* at 106. The plaintiff was injured after she asked to visit the restroom but hospital staff "ordered her to walk" there unaccompanied, where she fell and was injured. *Id.* The Kentucky Court of Appeals affirmed the circuit court's determination that the plaintiff was required to file a certificate of merit with her Complaint despite the plaintiff's characterization of her claim against the hospital as one of "ordinary negligence." *Id.* at 106, 109.

More specifically, in *Evans*, the plaintiff argued to the trial court that KRS § 411.167 did not apply because "as she had yet to receive medical treatment at the time of her fall, her action was not one for medical negligence." *Id.* at 106. She maintained on appeal that "the provisions of KRS 411.167 are inapplicable because this case is essentially 'a cross between a simple negligence

action and a premises liability case' and that it is *not* a medical negligence action," and that the "circuit court simply misinterpreted the nature of her complaint." *Id.* at 107 (emphasis in original).

However, the *Evans* court looked to the allegations contained in the plaintiff's complaint and determined they "negate[] this argument." *Id.* Though the complaint alleged "[t]here were no medical services provided at the time of the incident that caused or contributed to the damages complained herein," it also alleged that "at all times relevant herein, the medical doctors, nurses, staff and other personnel involved in the care of Mary Evans were employees, servants, agents, and ostensible agents of the hospital and all of these individuals acted within the scope of their employment in connection with the treatment, care, and direction of Mary Evans" and that "the negligence of such individuals is imputed to the hospital, and the hospital is otherwise liable for damages to Mary Evans based on the conduct of such individuals." *Id.* at 107–08 (cleaned up). While the facts make clear that no patient-doctor relationship had been established at the time of plaintiff's injury, the Kentucky Court of Appeals determined that the allegations in the complaint "indicate that Evans intended to base her cause of action against the hospital upon the alleged professional negligence of the health care providers involved in her care," particularly considering the allegation "that hospital staff 'knew or with any training whatsoever would have known Evans should not have been required to self-ambulate given the symptoms she presented.'" *Id.* at 108 (cleaned up). The Court, therefore, rejected the plaintiff's later attempt to characterize her claims as "ordinary" negligence.

This case presents analogous claims. Though no patient-doctor relationship was established between Pryor and Dr. Wells in the traditional sense, the specific allegations contained in the Complaint make clear that Pryor believes Dr. Wells failed to exercise appropriate professional, medical judgment when verifying and reporting Pryor's drug test results. Pryor's

causes of action are squarely rooted in the "alleged professional negligence," *id.*, of Dr. Wells and Baptist, and Pryor's labeling them as "ordinary negligence" now does not change that.

The Complaint describes Dr. Wells as "a Medical Review Officer" who "verified the result of Mr. Pryor's November 18, 2022 urine drug test as positive for Codeine in contravention of U.S. Department of Transportation [] federal drug testing regulations, U.S. Department of Health and Human Services [] guidance, and well-established national standards of practice." [R. 1 (Complaint), ¶ 1]. It further describes "Baptist Health's MRO employees, including Defendant Dr. Michael Wells," as "licensed physicians who are responsible for receiving and reviewing laboratory results generated by an employer's drug testing program and ensuring the accuracy and integrity of the drug testing process." *Id.* at ¶ 10. In outlining their professional duties of care, the Complaint states that Baptist and Dr. Wells were responsible for "advocat[ing] for the accuracy and integrity of the drug testing process" and for "properly determin[ing] if there is a legitimate *medical explanation* for laboratory confirmed positive drug test results." *Id.* at ¶ 15 (emphasis added). And the Complaint alleges they breached those duties owed to Pryor by failing to "ensure the accuracy and integrity of Mr. Pryor's drug testing process" and failing to "determine that there was a legitimate *medical explanation* for laboratory confirmed positive drug test results from Mr. Pryor's November 18, 2022 urine drug test." *Id.* at ¶ 16 (emphasis added); *see also id.* at ¶ 19.

Further, the Complaint explains that "MRO practice standards are based on DOT and DHHS federal regulations and guidelines, professional society guidelines, training materials from MRO courses, and the usual practices of MROs." *Id.* at ¶ 20. It also alleges that, after Pryor informed Dr. Wells that he had consumed poppy seeds, "[t]he burden was on Baptist Health and Dr. Michael Wells to corroborate through *clinical evidence* that Mr. Pryor engaged in unauthorized opiate use." *Id.* at ¶ 22 (emphasis added). The Complaint further charges that Dr. Wells failed to

obtain "*clinical evidence* of unauthorized/illegal use of morphine, codeine, or heroin, contrary to DOT regulations, DHHS guidance, and industry standards of practice." *Id.* at ¶ 22 (emphasis added).

Despite these claims of professional negligence contained in his Complaint, Pryor now argues the Complaint alleges simple negligence because Defendants "falsely reported" his drug test. [R. 14, p. 2]; *see also id.* at pp. 8–9 (Pryor argues his Complaint alleges "negligent reporting of a confirmed positive drug test"). Like the plaintiff in *Evans*, and notwithstanding Pryor's repackaging effort, the allegations in his Complaint clearly signal claims of professional medical negligence.

The regulations relied on by Pryor and cited in the Complaint similarly inform the Court that this is not simply a case of "false reporting" of a drug test. Rather, the regulations require the MRO to undertake a medical verification process upon receipt of a positive drug test. They specifically require that where, as here, the test for codeine registers less than 15,000 ng/mL, the MRO "must verify a confirmed positive test result only if [the MRO] determine[s] that there is *clinical evidence*, in addition to the test, of unauthorized use of any opium, opiate, or opium derivative (i.e., morphine, codeine, or heroin)." 49 C.F.R. § 40.139(c) (emphasis added). The regulations further provide that "it is [the MRO's] responsibility to use [his/her] *best professional and ethical judgment and discretion to determine whether there is clinical evidence of unauthorized use of opiates.*" *Id.* at § 40.139(c)(1) (emphasis added). That subsection explains: "[e]xamples of information that you *may* consider in making this judgment include, but are not limited to, . . . (i) Recent needle tracks; (ii) Behavioral and psychological signs of acute opiate intoxication or withdrawal; (iii) Clinical history of unauthorized use recent enough to have

produced the laboratory test result; [and] (iv) Use of a medication from a foreign country." *Id.* at § 40.139(c)(1)(i)–(iv) (emphasis added).

Pryor misquotes the regulations in arguing that Dr. Wells was *required* to "conduct, or cause another physician to conduct, a face-to-face examination" since his positive result for Codeine was below 15,000 ng/ml. [R. 14, p. 4] (quoting 49 C.F.R. § 40.139(2)(i)). He argues that Dr. Wells's failure to do so automatically translates into "ordinary negligence," rather than medical negligence. [R. 14, pp. 4, 8-9]. The list Pryor cites to, as the Court quoted above, is neither exhaustive nor mandatory. Indeed, the regulations in 49 C.F.R. § 40.139(c)(1)(i)–(iv), offer "[e]xamples of information that [an MRO] *may* consider in making this judgment," but specifically state that MROs "are not limited to" those examples. 49 C.F.R. § 40.139(c)(1) (emphasis added). While the regulations *do* provide that "[i]n order to establish the clinical evidence referenced in paragraphs (c)(1)(i) and (ii) of this section, personal observation of the employee is essential," they *also* note that "[n]o face-to-face examination is needed in establishing the clinical evidence referenced in paragraph (c)(1)(iii) or (iv) of this section." *Id.* at § 40.139(c)(2).

Regardless, the point is, this action implicates whether Dr. Wells exercised (or failed to exercise) his best professional and ethical judgment in undertaking the medical verification process triggered by Pryor's positive drug test before reporting those drug test results. Stated another way, Pryor's claim, distilled, is that Dr. Wells failed to use his "best professional and ethical judgment" in verifying whether there was "clinical evidence of unauthorized use of opiates." *Id.* at § 40.139(c)(1); *see also* [R. 1 (Complaint), ¶ 16] (alleging Defendants breached their duty of care to Pryor in failing "to properly determine that there was a legitimate *medical explanation* for the laboratory confirmed positive drug test results") (emphasis added); [R. 14, p. 3] ("This case arises out of both Baptist's and Dr. Wells' breaches of their duty of care 'to advocate for the accuracy

and integrity of the drug testing process and to *properly determine if there is a legitimate medical explanation* for laboratory confirmed positive drug test results.'") (emphasis added). Pryor's position that his Complaint simply alleges "negligent reporting of a confirmed positive drug test," [R. 14, pp. 8–9], or that Defendants simply "falsely reported" the drug test, *id.* at 2, is inconsistent with the substance of the Complaint itself and the plain language of the regulations on which he relies and too narrowly construes his claims.

In his Notice of Supplemental Authority, [R. 18],[1] Pryor points to a recent Kentucky Court of Appeals decision discussing the certificate of merit requirement. *See Boston v. Commonwealth Health Corporation, Inc.*, 687 S.W.3d 409 (Ky. Ct. App. 2024). There, the court was confronted with a true "slip and fall" case, where the plaintiff sued a hospital for failure to properly maintain its premises. *Boston*, 687 S.W.3d at 412. Specifically, the plaintiff claimed he was injured when he tripped on a raised piece of cobblestone close to the hospital's entrance. After the hospital successfully moved to dismiss the plaintiff's claims for failure to comply with Kentucky's certificate of merit requirement, the plaintiff appealed. *Id.* at 410. In reversing and remanding the circuit court's decision, the Kentucky Court of Appeals analyzed the language of the statute and surrounding legislative enactments to determine whether the word "negligence" in KRS 411.167 included *any* negligence actions against a hospital, including "ordinary" negligence claims such as a slip and fall action. *See id.* at 410–14. After evaluating the language of the statute and its various subsections, the court also relied on the title to the Act under which the specific statute was enacted, stressing that "premises liability claims [] fall[] well outside the Act's stated title of 'AN ACT relating to medical malpractice.'" *Id.* at 414. The Kentucky Court of Appeals ultimately

---

[1] Although Pryor directed the Court to *Boston* in his Notice of Supplemental Authority [R. 18], he made no attempt to meaningfully engage with the case or apply its holding to the particular facts of this case.

found that "KRS 411.167 only applies to 'negligence' actions that could be considered a species of medical malpractice." *Id.*

But *Boston* does not help Pryor. *Boston* was a true "slip and fall" case, devoid of any allegations of professional medical negligence. Further, *Boston*'s reasoning and discussion of the *Evans* case confirm that where the complaint includes allegations that sound in professional medical negligence, such actions fall within the statute's requirements as "actions that could be considered a species of medical malpractice." 687 S.W.3d at 414. The Kentucky Court of Appeals distinguished the two cases, noting that, "[i]n *Evans*, regardless of whether the hospital's alleged 'negligence' could have been classified as 'ordinary' or 'professional,' the claimant's 'slip and fall' injury stemmed not from a hazard on the hospital's premises as here, but from the hospital's care and treatment of the claimant" since she "was allegedly injured due to the hospital staff's exercise (or lack of exercise) of either common-sense or professional judgment regarding her *medical* condition – a quintessential example of medical malpractice or its subspecies, medical negligence." *Id.* at 415 (citing *Evans*, 643 S.W. 3d at 108) (emphasis in original). And though the court did not expound upon what types of actions constitute a "species of medical malpractice," it appropriately reasoned that "[a] normal slip and fall case does not qualify as such and is thus not subject to KRS 411.167." *Id.* Careful review of Pryor's Complaint, as outlined above, indicates that this case is far more like *Evans* than *Boston*, and it cannot be fairly categorized as anything other than one for medical negligence, a "species of medical malpractice." *Id.*

As stated, in *Evans*, the Kentucky Court of Appeals found that the plaintiff intended to base her cause of action against the hospital in "the alleged professional negligence of the health care providers involved in her care." 643 S.W.3d at 108. As explained in more detail by the *Boston* court, that was largely because Evans argued she was injured "due to the hospital staff's exercise

(or lack of exercise) of either common-sense or professional judgment regarding her medical condition." *Boston*, 687 S.W.3d at 415. In the same way, here, Pryor's claims are directed at Dr. Wells's exercise (or lack of exercise) of his professional judgment concerning the level of Codeine appearing in Pryor's blood. His claims flatly concern the alleged professional medical negligence of the Defendants and are sufficiently similar to fall within the Kentucky Court of Appeals' reasoning in *Evans* and *Boston*.

That is, Pryor claims Dr. Wells negligently performed the medical verification process required under the applicable regulations upon receipt of Pryor's positive drug test for Codeine. Again, though Pryor argues the Complaint simply alleges "negligent reporting of a confirmed positive drug test," [R. 14, pp. 8–9], compare, for example, Pryor's claims with allegations that an MRO inadvertently mixed up one individual's drug test results with those of another and reported the incorrect results. The latter could conceivably be considered a true case of "ordinary" negligence in "falsely reporting" the test results, as the conduct at issue would not have involved medical or professional judgment of any kind. But the former, as alleged by Pryor, implicates conduct which federal regulations require a licensed physician perform, and which requires the use of medical and professional judgment based on clinical evidence. Indeed, here, as outlined above, Pryor's Complaint, and the regulations on which he relies, implicate whether Dr. Wells (and Baptist vicariously) exercised or failed to exercise his "best professional and ethical judgment" in determining whether there was "clinical evidence of unauthorized use of opiates," 49 C.F.R. § 40.139(c)(1), and in verifying and reporting Pryor's drug test "to determine if there is a legitimate medical explanation for [the] laboratory confirmed positive drug test results." [R. 14, p. 3]; *see also* [R. 1, ¶ 16]. Though not a precise parallel with the claims in *Evans*, Pryor plainly alleges that Dr. Wells negligently exercised his professional medical judgment in verifying (or

failing to adequately verify) the drug test results. His claims therefore trigger compliance with KRS § 411.167 through the filing of a certificate of merit, or one of the exceptions or alternatives outlined therein.

One additional point on Kentucky law post-*Boston* is worth mentioning. Defendants appear to argue for an expansive interpretation of *Evans*, believing it stands for the proposition that dismissal would be required here even if the Court concluded that Pryor's claims sounded in "ordinary" negligence. *See* [R. 17, p. 3]. The Defendants seize on the following language from *Evans*:

> Regardless of whether we conclude that Evans's action against Baptist Health is one for ordinary negligence or one for malpractice, the circuit court did not err by concluding that the provisions of KRS 411.167 applied. In an action against a hospital for negligence or malpractice, KRS 411.167(1) requires the filing of a certificate of merit. On the other hand, *even if we were to conclude that Evans's complaint stated a cause of action for ordinary negligence (for which expert testimony would not be required), the provisions of KRS 411.167(4) would nonetheless still apply. KRS 411.167(4) requires the complaint to be accompanied by an "affidavit or declaration that no cause of action is asserted for which expert testimony is required."* No such affidavit or declaration was filed in the trial court.

643 S.W.3d at 108 (emphasis added). Along the same lines, in his sur-reply, Pryor spends several pages discussing statutory interpretation and why this Court should decide, apparently in the first instance, that KRS § 411.167 would *not* apply to claims against a doctor for acts of "ordinary" negligence performed in the scope of his employment. *See* [R. 16-1, pp. 3–6]. *Boston*'s extensive statutory interpretation analysis, which culminates in its finding that "KRS 411.167 only applies to 'negligence' actions that could be considered a species of medical malpractice," *Boston*, 687 SW.3d at 414, undercuts such a broad reading of *Evans*. In any event, the Court need not endeavor to resolve this issue. As explained above, Pryor's claims against Dr. Wells and Baptist are not ordinary negligence claims.

Finally, despite the existence of persuasive Kentucky case law on the relevant issues, Pryor looks to several cases from other states to support his ordinary negligence argument. Of course, these extra-jurisdictional cases are not binding on this Court. *See Ellis v. Wal-Mart Stores E., LP*, No. CV 09-361-GFVT, 2010 WL 11527355, at *4 (E.D. Ky. Jan. 27, 2010) ("Ellis again cites no case law from this circuit in support of this argument but instead refers to cases from district courts in other jurisdictions, which are not binding on this Court."). Moreover, as discussed more below, they are not persuasive on the specific issue this Court faces. *See RMT, Inc. v. SPE Util. Contractors L.L.C.*, No. 09-11650-BC, 2009 WL 2777347, at *5 (E.D. Mich. Aug. 27, 2009) (granting motion to dismiss and noting "extra-jurisdictional cases cited by Plaintiff are not binding and further are not factually relevant or legally persuasive"). For this reason alone, and in light of the relevant Kentucky precedent, the cases Pryor cites are unhelpful to the Court's analysis.

First, Pryor cites *King v. Garfield Cnty. Pub. Hosp. Dist. No. 1*, 17 F. Supp. 3d 1060 (E.D. Wash. 2014), which he suggests "addressed the precise issue that Baptist and Dr. Wells raise here[:] What standard applies when a medical review officer negligently interpreted results of a drug test ordered by an employer that resulted in the employee's termination?" [R. 14, p. 9]. In Pryor's own words, "Because neither party suggested that the medical review officer diagnosed or treated the employee or had reason to know of employee's health status other than as related to a single urinalysis solely intended to identify drug use, the Court considered the medical review officer's negligence under general negligence principles." *Id.* (citing *King*, 17 F.Supp.3d at 1072). Setting aside the fact that *King* was later reversed on other grounds, *see King v. Garfield Cnty. Pub. Hosp. Dist. No. 1*, 641 F. App'x 696, 698 (9th Cir. 2015), Pryor disregards a crucial distinguishing aspect of this case—Kentucky's unique certificate of merit requirement.[2] In *King*,

---

[2] Washington does not have a comparable certificate of merit requirement, as it was struck down in 2009 by the Washington Supreme Court in *Putman v. Wenatchee Valley Med. Ctr., P.S.*, 216 P.3d 374 (2009).

rather, the district court analyzed Washington's particular statute defining medical malpractice as "injury occurring as a result of healthcare" in order to determine how to analyze the plaintiff's claim at summary judgment, ultimately determining that drug testing would not fall under that category. *King*, 17 F.Supp.3d at 1071 (quoting RCW § 7.70.010). To do so, the court also looked to Washington case law construing the phrase "health care" to mean "the process in which a physician is utilizing the skills which he had been taught in examining, diagnosing, treating or caring for the plaintiff as his patient." *Id.* (citation omitted). *King* dealt with dissimilar statutory language and Washington-specific case law to resolve an entirely different issue than the Court considers here. *King* is thus unpersuasive on this discrete issue of Kentucky law.

The other cases Pryor cites are similarly unpersuasive. In *Ryan v. Quest Diagnostics Clinical Lab'y, Inc.*, No. 22-CV-1687-TWR-KSC, 2023 WL 4879827 (S.D. Cal. July 31, 2023), the Southern District of California determined that the plaintiff had plausibly alleged a medical review officer owed a duty of care in testing a urine specimen, *id.* at *4, but that does not shed any light on whether the claim is properly categorized as one for ordinary or medical negligence under Kentucky's unique statute. Indeed, the parties in *Ryan* did not raise the "ordinary versus medical negligence" issue, and the court therefore did not consider it. Ryan is *thus* inapposite to the Court's analysis here. Similarly, in *Webster v. Psychemedics Corp.*, No. 2010-01087-COA-R3-CV, 2011 WL 2520157 (Tenn. Ct. App. June 24, 2011), the Tennessee Court of Appeals held that a testing laboratory contracted to perform drug testing "owed a duty of due care in administering the drug test[s]" and that, more specifically, "[w]hen an individual is required, as a condition of employment, to submit a sample for testing, a duty of care is imposed between the professional testing entity and the employee." *Id.* at *6. But as with *Ryan*, the discrete issues before this Court—whether this type of claim is properly considered one for ordinary or medical negligence and

application of KRS 411.167 in claims against a hospital and physician—were not at issue in *Webster*. Likewise, in *Sharpe v. St. Luke's Hosp.*, 573 Pa. 90 (2003), the Pennsylvania Supreme Court determined a "Hospital owed [the plaintiff] a duty of reasonable care with regard to collection and handling of her urine specimen for the employment-related drug testing," which again sheds no light on the specific issue this Court faces—whether the alleged breach of such a duty is properly considered medical or ordinary negligence. The Court thus finds *Webster* and *Sharpe* entirely unhelpful for purposes of this analysis.

In sum, KRS § 411.167 applies to Pryor's claims against Dr. Wells, a licensed physician and Medical Review Officer, because the claims involve the alleged professional medical negligence of Dr. Wells, claims constituting "a species of medical malpractice." *Boston*, 687 S.W.3d at 414. Because Pryor did not file a certificate of merit with his Complaint or otherwise meet one of the statute's exceptions or alternative means of compliance, his claims against Dr. Wells must be dismissed without prejudice. *See Evans*, 643 S.W.3d at 109 ("[W]e are compelled to conclude that [plaintiff's] failure to comply with the clear requirements of KRS 411.167 warranted the trial court's decision to dismiss the action *without prejudice*.") (emphasis added). For all the same reasons, and because Pryor's vicarious liability claims against Baptist are based upon his claims against Dr. Wells, those claims will likewise be dismissed without prejudice. *Id.*

**IV. Conclusion**

For the foregoing reasons, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Plaintiff Paul Pryor's Motion for Leave to File a Sur-Reply [**R. 16**] is **GRANTED**.
2. Defendants' Motion to Dismiss [**R. 11**] is **GRANTED**. Pryor's Complaint is **DISMISSED without prejudice**.

3. A separate Judgment will issue.

This the 25th day of July, 2024.

*Claria Horn Boom*
CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

Cc: Counsel of Record